**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **BOBBIE WARREN, INDIVIDUALLY AND AS ADMINISTRATOR FOR THE ESTATE OF PATRICK WARREN, SR.,** | § § § § | |
| **Plaintiff,** | § § | **CASE NO. 6:22-CV-1296-ADA-DNM** |
| ***v.*** | § § § | |
| **REYNALDO CONTRERAS,** | § § | |
| **Defendant.** | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
<u>ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT NO. 18]</u>**

**TO:    THE HONORABLE ALAN D ALBRIGHT,
    UNITED STATES DISTRICT JUDGE**

This Report and Recommendation is submitted to the District Court pursuant to United States Code Title 28, Section 636, Federal Rule of Civil Procedure 72, and Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Before the Court is Defendant Reynaldo Contreras's Combined No Evidence and Traditional Motion for Summary Judgement. Dkt. No. 18. The Court held a hearing on the Motion on February 5, 2026. Having considered the Motion, the Response, the Reply, and the supplemental authority briefing by the Parties, the Court **RECOMMENDS** that the District Court **GRANT** the Motion for the following reasons:

## I.    <u>FACTUAL BACKGROUND</u>

At 5:45 p.m. on January 10, 2021, Killeen Police Officer Raynaldo Contreras shot Patrick Warren, Sr., three times as Mr. Warren lunged at a retreating Contreras. Unfortunately, Mr. Warren died at the hospital a short time later. Mr. Warren's wife, Bobbie Warren, brings this lawsuit individually and as the administrator of Mr. Warren's estate. Dkt. No. 1. She claims that Contreras's decision to shoot Mr. Warren was an excessive use of force that violated Mr.

Warren's Fourth Amendment rights. *Id.* Contreras denies this claim and argues that he is entitled to qualified immunity. Dkt. No. 18.

### The Video and Undisputed Facts

Although the parties dispute how the law applies to the facts, they largely agree on the facts themselves because Contreras's body camera recorded the entire episode. While the video does not include the radio communication between Contreras and the dispatcher before he arrived at the Warren house, it does capture the sequence of events from the time Contreras, in police uniform, exits his marked patrol vehicle in front of the Warren house until after EMS arrives. For the purposes of this Report and Recommendation, the factual summary relies on Contreras's body camera footage, attached to the Motion for Summary Judgment as Exhibit 2, unless indicated otherwise.

### Initial Dispatch and Arrival

Dispatch sent Contreras to the Warren house after Mr. Warren's family members called the police to report concerns that Mr. Warren might injure his son. Dkt. No. 18-1 at 50–52. The caller told the police about a previous mental health call involving Mr. Warren and reported that there were no firearms in the house. Dkt. No. 18-4 at 23, 34. Dispatch relayed this information to Contreras while he drove to the Warren house. *Id.* As a result, Contreras knew that the situation might involve a mental health issue, that Mr. Warren was acting aggressively toward family members, and that the caller claimed there were no firearms in the house.

Contreras's unremarkable arrival at the Warren house did not suggest how the next three-and-a-half minutes would unfold. As he walked from his patrol vehicle to the Warrens's front door, Contreras radioed the license plate numbers for the two cars parked in the driveway. He then approached the front door and rang the doorbell. Contreras identified himself as a police

officer. One or more people yelled through the door inviting him inside. Contreras asked if the door was open. When someone told him it was, he opened the door and stepped just inside the front door one minute and 36 seconds after exiting his vehicle.

### *Inside the Threshold*

With Contreras standing at the threshold, the video shows a hallway extending from the front door toward the back of the house. To his right is what appears to be a dark living room lit only by a string of LED lights and a television. Next to the living room, another room appears completely dark. Another dark room lies further up the hallway in front of Contreras. Mr. Warren and at least one other person stand at the far end of the hallway and encourage Contreras to walk toward them. Mr. Warren begins yelling, and Contreras states that he is going to walk back outside. Contreras later testified that he believed it was unsafe to walk into the house alone because he could not see all the people or all the areas where people might have been hiding. Dkt. No. 21-4 at 34.

As Contreras began to exit the house, Mr. Warren yelled at him and rapidly approached. Contreras stepped out of the house, and he or someone inside closed the door behind him. He remained inside the threshold of the house for less than 20 seconds.

### *Waiting for Backup*

Contreras then stood outside waiting for additional officers to arrive. Mr. Warren yelled unintelligibly inside the house, and Contreras—initially with his back to the house—spoke over his radio. The sirens of approaching police cars are heard less than a minute after Contreras exited the house.

Contreras remained standing outside the front door as the sirens grew louder. He advised someone on the radio that he had exited the house, that he believed there were about six people

inside, and that Mr. Warren had rushed toward the door as Contreras was leaving. Ten seconds later, he reported that Mr. Warren had closed the door and that he was waiting for backup.

### Mr. Warren Opens the Door

Mr. Warren suddenly opened the front door one minute and 41 seconds after Contreras exited the house. Standing in the doorway, Mr. Warren yelled at Contreras and extended his right arm toward him. Mr. Warren kept his left arm by his side and slightly behind him, out of view, so Contreras could not see his left hand. Contreras raised his taser, and the taser target light appeared in the middle of Mr. Warren's torso.

Contreras immediately told Mr. Warren twice to show his hands. Instead of showing both hands, Mr. Warren continued to yell and started to approach Contreras, who stood only a few steps away. Less than five seconds after Mr. Warren opened the door, Contreras stated that he was "on taser point."

### The Taser Deployment

Contreras then began to walk backward away from the house. He again commanded Mr. Warren to show his hands, and Mr. Warren began waving his arms, which allowed Contreras to see both hands. Six seconds after Mr. Warren opened the door, Contreras brought his other hand up to the grip of his taser.

While backing away, Contreras commanded Mr. Warren to get on the ground. Mr. Warren responded by waving his arms in circles and continuing to approach. Contreras told him to get down on the ground three more times. Mr. Warren continued yelling, growling, and waving his arms as he approached, while Contreras continued to back away. Several people appeared at the door behind Mr. Warren. Contreras warned Mr. Warren twice that he would use the taser, but Mr.

Warren kept advancing. Contreras then fired his taser 15 seconds after Mr. Warren opened the front door.

Mr. Warren fell to the ground, and Contreras lowered the taser. Mr. Warren rolled onto his back, and Contreras radioed that he had used his taser once. Mr. Warren then rolled onto his stomach and began to push himself up. Contreras commanded Mr. Warren to lie on his back. Only 24 seconds after opening the front door, Mr. Warren fell back to the ground after he was tased a second time, and Contreras again told him to lie on his back. Mr. Warren ignored these commands to stay on the ground, disregarded the pain from the taser, stood up, growled, and approached Contreras with his arms stretched out in front of him. Mr. Warren apparently removed the taser prongs, because the taser can be heard firing again with no effect 27 seconds after he opened the door.

### *The Shooting*

Mr. Warren continued to pursue Contreras as Contreras backpedaled across the front yard toward the neighbor's driveway. Contreras commanded Mr. Warren to stay back, drew his gun, and warned Mr. Warren that he would shoot. Mr. Warren continued to pursue him as he crossed through bushes onto the neighbor's slippery, ice- and snow-covered driveway. Contreras again told Mr. Warren that he would shoot. As Mr. Warren lunged at Contreras, coming within inches of landing on or grabbing him, Contreras fired three shots. Mr. Warren fell to the ground 32 seconds after he opened the door.

Although shot, Mr. Warren tried to stand. Another officer arrived and helped secure Mr. Warren. EMS arrived and, despite Mr. Warren's physical struggles, placed him on a gurney.

*Summary*

In the 32 seconds between Mr. Warren opening the door and Contreras shooting him, Contreras gave Mr. Warren a total of 14 commands or warnings. During that time, Contreras retreated across the front yard and onto the neighbor's driveway. Mr. Warren yelled, growled, and pursued Contreras across the yard while ignoring these commands and warnings. Contreras attempted to use less than deadly force when he deployed his taser. The episode was a tense and rapid series of events with tragic consequences.

## II.    LEGAL STANDARD

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. FED. R. CIV. P. 56(c). The Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Because of the video and audio from the body camera, there is no dispute regarding the material facts.

*Excessive force*

To prove a constitutional violation based on excessive force, a plaintiff must show: (1) an injury; (2) that resulted directly from the use of force that was clearly excessive to the need; and (3) the force used was objectively unreasonable. *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016). The focus of the "inquiry is simply the reasonableness of the force employed." *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "The objective-reasonableness inquiry is fact-intensive." *Galvan v. City of San Antonio*, 435 F. App'x 309, 310–11 (5th Cir. 2010) (per curiam) (internal quotation marks omitted). "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). When dealing with an uncooperative suspect, police act within the scope of objective reasonableness when they "react[ ] with measured and ascending responses." *Galvan*, 435 F. App'x at 311.

Under *Tennessee v. Garner*, deadly force is permitted to protect the safety of the officer or others. 471 U.S. 1, 11 (1985). *Garner* requires a warning before deadly force is used "where feasible," as part of attempting de-escalation. *Id. Garner* also requires a reviewing court to consider the threat posed by the suspect. *Id.* at 21. In doing so, a court must consider the risk of harm a suspect poses to the officer and others. *Id.*

In *Easter v. Cramer* a game warden tackled a fleeing unarmed suspect for whom an arrest warrant had issued. 785 F. App'x 602, 604 (10th Cir. 2019). They then rolled into a pond, the suspect shoved the officer underwater, and the officer shot him. *Id.* Even though the suspect was unarmed, the officer "remained in a vulnerable position, and a reasonable officer would have reason to believe that [the suspect] might use the water to drown him if the altercation continued." *Id*. at 608. Consequently, a suspect need not be "'armed with a deadly weapon [to pose] a physical threat sufficient to justify use of deadly force.'" *Id*. at 608 n.4 (quoting *Blossom v Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005)). That is particularly true when the unarmed suspect poses a threat of harm to the officer. *See id*.

"An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).  An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others. *Id*. The threat to the officer's life—and therefore the reasonableness of the force used—"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97.

### *Qualified Immunity*

Qualified immunity is an affirmative defense that shields from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If the law at the time of a constitutional violation does not give the officer "fair notice" that his conduct is unlawful, the officer is immune from suit. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). This standard thus protects an officer with a mistaken, yet reasonable, understanding of the law from the "hazy border between excessive and acceptable force." *Id.* at 201(quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). To overcome the affirmative defense of qualified immunity, the plaintiff must show that the officer violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Accordingly, the "objective legal reasonableness" of an officer's conduct must be "assessed in light of the legal rules that were 'clearly established' at the time" of his action. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted). A right is clearly established if, considering preexisting law, the unlawfulness of an action would be apparent to a reasonable

officer. *Id*. at 640. Consequently, the inquiry here is whether, under the law in effect at the time that Contreras shot Mr. Warren, no reasonable officer could have believed deadly force was lawful when a suspect disobeyed 14 different commands, chased a retreating officer across a yard, withstood being tased, and lunged at the backpedaling officer.

The Supreme Court's more recent qualified immunity decisions in excessive use of force cases do not shift this analysis. In *Kisela v. Hughes*, police officers in Tucson, Arizona responded to a call that a woman was behaving erratically with a knife and that she had been hacking at a tree. 584 U.S. 100, 101 (2018). When officers arrived on scene, the suspect, Amy Hughes, emerged from a house holding a large kitchen knife, and approached to within "striking distance" of a bystander in the driveway. *Id.* One of the officers, Andrew Kisela, whose further approach was impeded by a chain-link fence, repeatedly ordered Hughes to drop the knife, but Hughes did not follow his commands. *Id*. at 101–02. Kisela then fired at Hughes through the fence. *Id* at 102. Reviewing a denial of qualified immunity, the Supreme Court held that the law did not clearly establish that the officer's resort to deadly force was unlawful considering the officer's limited knowledge of the situation and Hughes's refusal to follow his repeated commands to drop the knife while within striking distance of the bystander—obstinance that heightened the risk of immediate harm to another. *See id.* at 105–06.

### III.    ANALYSIS

It is undisputed that Mr. Warren refused to comply with Contreras's commands. One wonders what might have happened to Contreras, Mr. Warren, and the others nearby had Contreras not fired his gun. Contreras had drawn his gun, so it would have been accessible to Mr. Warren. In addition, as Contreras had stepped on to the ice and snow covered driveway at the time Mr. Warren contacted him, Contreras could have landed on his back with Mr. Warren on top

of him. The result is that Contreras was faced with a situation where a noncompliant person unaffected by the pain caused by the taser was only a few feet away while Contreras was backpedaling toward a slick surface.

### *Excessive Force*

It is hard to fathom what else Contreras reasonably could have done. At the first sign of danger inside the house, he deescalated by exiting. He then waited for backup to arrive, gave numerous commands that Mr. Warren ignored, and attempted to avoid a conflict.

As soon as Mr. Warren opened the door, Contreras backed away rather than trying to engage him. Mr. Warren responded with yelling and wild gestures. To mitigate the danger, Contreras ordered Mr. Warren to the ground, but Mr. Warren refused to comply. When those efforts at de-escalation failed, Contreras drew his taser and warned Mr. Warren.

Rather than becoming compliant, Mr. Warren became increasingly noncompliant. He continued to yell and swing his arms. He refused to comply with any of Contreras's directions and stepped toward him. At that point, Contreras fired the taser.

Despite Contreras's deescalation efforts and his use of nonlethal force, Mr. Warren became more combative. After using his taser twice without stopping Mr. Warren, Contreras saw Mr. Warren rip the taser prongs from his body and continue to advance rapidly toward him. Contreras again retreated, pulled his gun, and issued additional warnings. Mr. Warren reacted by lunging at Contreras just as Contreras reached the slippery surface of the neighbor's driveway.

Before Contreras fired his gun, he exited the house, waited for backup, retreated from Mr. Warren, used his taser twice, watched Mr. Warren remove the taser prongs, and gave a total of 14 warnings. Contreras tried to avoid the situation, and his decision to use deadly force was reasonable under the circumstances because the undisputed facts demonstrate that it was

reasonable for Contreras to believe that Mr. Warren presented a real threat of serious bodily injury or death. Even if his decision to use deadly force was not reasonable and violated Mr. Warren's constitutional rights, those rights were not clearly established at the time of the incident. Consequently, Contreras is still entitled to qualified immunity.

Mrs. Warren argues that, because he was unarmed, her husband did not pose a threat sufficient to warrant the use of deadly force. When an officer uses a gun to protect himself from a rapidly escalating, aggressive threat, the cases suggest that the analysis focuses on the danger the suspect presents, not solely on whether the suspect holds a weapon at that moment. While an officer may not use deadly force against an unarmed non-dangerous, compliant, or fleeing suspect, that is not the situation Mr. Warren presented. It is the danger the suspect poses that matters. As addressed herein, the relevant precedent shows that whether a suspect is armed, fleeing, compliant, or actively committing a crime are facts that inform whether the suspect is dangerous.

Although Mr. Warren was unarmed, that fact does not end the inquiry under *Tennessee v. Garner*, which focuses on whether the suspect "poses a threat of serious physical harm." *Garner*, 471 U.S. at 11. Here, Mr. Warren's aggressive advance on a retreating officer, his refusal to comply with repeated commands, and his ability to overcome the taser together created an immediate threat of serious physical harm despite the absence of a visible weapon.

Mrs. Warren argues that the force was excessive in part because her husband was not committing a crime. It is arguable that Mr. Warren was committing a crime, but whether he was committing a crime is not dispositive. As the Fifth Circuit has noted, the important question is whether the suspect is "dangerous or benign" and "not whether the suspect is suspected of committing a felony or a misdemeanor." *Fraire v City of Arlington*, 957 F.2d 1268, 1276 n.29

(5th Cir. 1992). Consistent with *Fraire*'s emphasis on whether a suspect is "dangerous or benign," the undisputed video evidence shows that Mr. Warren moved rapidly toward Contreras, disregarded all attempts at de-escalation, and closed the distance even after being tased twice, leaving Contreras with only seconds to respond as he backpedaled on a slick driveway.

Plaintiff also argues that Contreras's use of deadly force was unreasonable because he could have employed other, less-lethal options such as OC spray, his baton, or the taser in drive-stun mode. The Fourth Amendment, however, does not require an officer to use the least intrusive means of force, only that the force the officer does use is objectively reasonable under the circumstances, as *Graham* notes. *See* 490 U.S. 396–97. Here, by the time Contreras fired, Mr. Warren had ignored fourteen commands, advanced rapidly despite a full taser deployment, removed the taser prongs, and closed to within a few feet of a lone officer who was backpedaling on an ice- and snow-covered driveway with his firearm drawn. Under those conditions, it was not objectively unreasonable for Contreras to choose deadly force rather than attempt additional intermediate options.

Considering "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest," the facts here support the reasonableness of Contreras's response. *Galvan*, 435 F. App'x at 310–11. Mr. Warren rapidly advanced on a lone officer, ignored 14 commands, appeared undeterred by a taser deployment, and continued to pursue Contreras as he retreated onto an ice- and snow-covered driveway while his firearm was drawn. Accordingly, the Court finds that Contreras's actions do not rise to the level of excessive force.

### *Qualified Immunity*

While Mr. Warren was unarmed, that was not obvious from Contreras's perspective. Moreover, Mr. Warren was not fleeing like the suspect in *Garner*. Instead, he was continuously noncompliant, unaffected by Contreras's taser, and rapidly advanced on a backpedaling police officer. Mr. Warren's actions placed Contreras in a precarious position and forced him to act quickly. Reasonable people may disagree about whether Contreras made the right choice, but that very possibility of honest disagreement shows that the decision was not objectively unreasonable. It cannot be said that the law so clearly and unambiguously prohibited Contreras's conduct or that every reasonable police officer would have known that Contreras's actions violated the law. Because "reasonable public officials could differ on the lawfulness of [Contreras's] actions, [Contreras] is entitled to qualified immunity." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990).

Mrs. Warren primarily relies on three Fifth Circuit cases to argue that Contreras should have known his conduct violated Mr. Warren's constitutional rights. Each case is easily distinguishable. Not one involves a lone officer confronted by an increasingly aggressive and noncompliant individual who attempted to attack the officer after the officer repeatedly tried to avoid using lethal force.

In *Crane v. City of Arlington, Texas*, a police officer used deadly force by shooting a suspect while applying a chokehold to the suspect inside a vehicle that was running but in park. *See* 50 F.4th 453, 464 (5th Cir. 2022). First, unlike here, there were significant disputes regarding many material facts, which the court therefore construed in favor of the plaintiff. *See id.* at 461–62. Second, the circumstances surrounding the confrontation differed significantly. *See id.* at 462–64. Multiple officers surrounded the car. *Id.* at 464. While the suspect had been non-compliant and there was a claimed fear that the car might be used as a weapon, the car remained

Page 13 of 19

in park and no one stood in front of it, making it highly unlikely that anyone would be hurt if it moved. *Id*. Finally, the officer could see whether the suspect had a gun, and he did not. *Id.* at 464–67. As a result, no one faced an imminent risk of serious injury when the officer used lethal force, a fact the court found determinative. *Id.* at 466–67. That scenario is far removed from a situation in which a person actively tries to harm a lone officer who is retreating after taking multiple steps to subdue an increasingly noncompliant suspect.

In *Joseph v. Bartlett*, a total of ten officers were present. 981 F.3d 319, 327–28 (5th Cir. 2020). At the time of the alleged excessive force, the suspect lay on the floor in the fetal position with a 300-pound officer on top of him. *Id.* at 326–27. Another officer also pinned him to the floor, and several other officers stood within feet of the suspect. *Id.* at 326–28. Despite the suspect's lack of resistance and the presence of numerous officers nearby, one officer tased the suspect and another struck him with a baton. *Id*. The suspect was then kicked and punched. *Id.* He did not try to fight or lunge toward anyone. *Id.* While he had been fleeing from officers earlier, he never tried to initiate physical contact with them. Instead, the pursuing officers caught up to him, cornered him in a narrow space with a large officer on top of him and others helping to hold him down, and he had effectively given up when the force at issue was used. *Id.* Those facts bear little resemblance to Mr. Warren's increasing combativeness, noncompliance, lack of reaction to the taser, and Contreras's actions while operating alone and retreating across the Warrens' front yard.

In *Ramirez v. Martinez*, there were factual disputes that do not exist here because of the video. 716 F.3d 369, 379 (5th Cir. 2013). Martinez, who was not the target of the law enforcement operation, was tased after he yelled at an officer and pulled away when the officer tried to handcuff him, then tased again after he lay on the ground in handcuffs. *Id.* at 372–73. *Id.*

He neither initiated nor attempted to initiate any physical contact with the officer. *Id.* The officer tased Martinez the second time after he had already subdued and handcuffed Martinez. *Id.* Those facts do not remotely resemble the circumstances Contreras faced when Mr. Warren confronted him.

Mrs. Warren argues that these three cases should have put Contreras on notice that his conduct violated Mr. Warren's rights. They do not. In none of these cases did a lone officer face a belligerent, increasingly noncompliant individual who appeared oblivious to the pain of a taser and who then lunged at the officer while the officer had his gun drawn. In each case, the suspect was largely under police control when the excessive force occurred. In each case, multiple officers were present. In two of the cases, the suspects were compliant when the excessive force occurred. None involved an officer who was attempting to retreat from the suspect. Unlike the officers in those cases, Contreras used measured, escalating responses and began the encounter by attempting to deescalate the situation. These cases set boundaries that Contreras's conduct does not even begin to approach.

Plaintiff also cites several non–Fifth Circuit cases for additional support. Each involves significantly different facts, and each presented factual disputes about what led to the use of force. The video of the incident involving Mr. Warren eliminates such factual disputes here.

*Deorle v. Rutherford* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat, no bystanders were nearby, the man had been "physically compliant and generally followed all the officers' instructions," and he had been under police observation for roughly 40 minutes. 272 F.3d at 1272, 1281–82. *Griffith v. Coburn* involved the use of a chokehold on a non-compliant suspect who was seated on a couch in a mental health facility, doing nothing more than keeping his hands under his body

Page 15 of 19

to keep officers from handcuffing him. 473 F.3d 650 (6th Cir. 2007). *Hopkins v. Andaya* involved the continued use of lethal force after it was no longer necessary. 958 F.2d 881 (9th Cir. 1992). In that case, eyewitnesses and independent medical evidence contradicted the officer's version of events. Finally, *Ingram v. Shipman-Meyer* involved the continued use of a chokehold after the suspect had already been subdued. 241 F. Supp. 3d 124 (D.D.C. 2017). Like *Crane*, *Joseph*, and *Ramirez*, these cases present facts and circumstances that are easily distinguishable from this case. While one might argue that they stand for the proposition that lethal force should not be used against someone who poses no risk of harm to others under similar circumstances, Mr. Warren did not fit that description.

Contreras's force was not excessive merely because Mr. Warren never actually made physical contact with him. It is unreasonable to require an officer facing an aggressive, noncompliant individual to wait until he is physically attacked when it is clear that an attack is imminent, particularly when the officer has already taken numerous steps to avoid a physical confrontation. An officer need not first be injured before acting in a situation like this.

Mrs. Warren also notes that dispatch informed Contreras, while he was driving to the house, that it had been told there were no firearms in the home. Of course, a report that there are no guns does not guarantee that the home in fact contains no firearms, nor does it rule out the presence of other weapons. Contreras could not simply accept that no weapons were present. Even if Contreras believed he lacked confirmation that firearms were in the house, that belief did not establish that no firearms—or any other weapons—were available to harm him.

As the Fifth Circuit explained in *Crane*, "[t]he central concept is that of fair warning, in which the contours of the right in question are sufficiently clear that a reasonable official would understand that what he is doing violated that right." *Crane*, 50 F.4th at 466–67. Neither *Crane*,

Page 16 of 19

*Joseph*, nor *Ramirez* suggests that an officer in Contreras's position, considering all that was happening and all that he knew, would understand that he could not use deadly force under these circumstances. Nor do *Deorle*, *Griffith*, *Hopkins*, or *Ingram*.

Under these circumstances, the force that Contreras used was not clearly excessive to the need, and any alleged excessiveness was not objectively unreasonable. Furthermore, Contreras's conduct was objectively reasonable in light of the clearly established legal rules at the time of the shooting. His conduct was not plainly incompetent or a knowing violation of established law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Given these facts, and considering the fact-specific guidance in *Crane*, *Joseph*, *Ramirez*, and *Brosseau*, a reasonable officer in Contreras's position would not have had "fair warning" that using deadly force in this rapidly evolving, close-quarters encounter violated clearly established law.

In the span of 32 seconds, Contreras gave Mr. Warren 14 instructions intended to deescalate the situation and bring him under control. Contreras began by instructing Mr. Warren to get on the ground after he opened the door. Contreras retreated and warned Mr. Warren that he would use his taser. After multiple warnings, Contreras used the taser. Contreras continued to retreat while telling Mr. Warren to lie on the ground, but Mr. Warren chased him. Contreras drew his gun and issued two warnings before Mr. Warren quickly closed the distance between them and lunged at him. Contreras had to respond rapidly.

Before taking any further action, Contreras removed himself from the initial confrontation by going back outside. He disengaged and called for backup, clearly intending to wait for assistance before doing anything else. It was Mr. Warren who chose to reengage and pursue Contreras.

Contreras used multiple tactics to minimize the use of force before resorting to deadly force in a rapidly developing situation. Courts have held that an officer should begin with the least severe means to control a situation and increase the level of force only as necessary when lower levels prove ineffective. That is what Contreras did.

Moreover, even if contrary authority existed, the "cases taken together [would] undoubtedly show that this area is one in which the result depends very much on the facts of each case" and would not "clearly establish" that Contreras's conduct violated the Fourth Amendment. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). Even taking plaintiff's authorities as the relevant universe of clearly established law, none of those authorities would have put the constitutionality of Contreras's conduct beyond debate on these facts. Therefore, Contreras's actions were objectively reasonable under clearly established law, and he is entitled to qualified immunity.

## IV.    CONCLUSION AND RECOMMENDATION

In this tragic case, the undisputed facts support the reasonableness of Contreras's use of force under the circumstances he faced. Even if his use of deadly force were deemed excessive and in violation of Mr. Warren's constitutional rights, Mrs. Warren has not shown that clearly established law put the constitutional question "beyond debate" in the situation confronting Contreras. Because Contreras's actions were not objectively unreasonable in light of clearly established law, he is entitled to qualified immunity. The Court therefore **RECOMMENDS** that the District Court **GRANT** Contreras's Motion for Summary Judgment (Dkt. No. 18).

## OBJECTIONS

The parties may wish to file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which

objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(l)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985).

**SIGNED** this 11th day of March, 2026.

DAN N. MACLEMORE
UNITED STATES MAGISTRATE JUDGE